# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-2254

_____

Jacqueline Barnhardt

*Plaintiff - Appellant*

v.

Open Harvest Cooperative

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 21, 2013
Filed: February 7, 2014

_____

Before WOLLMAN, COLLOTON, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jacqueline Barnhardt appeals the district court's[1] entry of summary judgment in favor of Open Harvest Cooperative ("Open Harvest") on her claim alleging a

_____

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

violation of § 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140. For the reasons discussed below, we affirm.

## I. Background

Open Harvest is a member-owned food cooperative located in Lincoln, Nebraska. Barnhardt began working at Open Harvest in September 1994 and ultimately attained the position of outreach and membership director. Open Harvest makes short-term disability insurance coverage available to its employees under a policy with Dearborn National Life Insurance Company ("Dearborn National"). However, Open Harvest does not pay or contribute any portion of the cost of coverage. Employees who opt to obtain short-term disability coverage must pay the entire premium through payroll deductions. Barnhardt enrolled in short-term disability coverage.

In December 2006, Barnhardt was diagnosed with arteriovenous malformation ("AVM"), a vascular condition that causes cognitive difficulties and occasional seizures. In January 2011, Kelsi Swanson became Open Harvest's general manager and, consequently, Barnhardt's supervisor. The following month, Swanson met with Barnhardt for her annual performance review. While Barnhardt received largely positive feedback and a three-percent raise, Swanson expressed concern about Barnhardt's time management and her interactions with coworkers. At some point during February 2011, Barnhardt disclosed her AVM to Swanson.

In late May, Swanson raised a number of concerns with Barnhardt about her conduct and performance, including her tardiness, unreasonably long lunch breaks, inappropriate comments to other employees, excessive delegation of her responsibilities, and lagging membership in the cooperative. Barnhardt sought to explain that she had not delegated her duties in order to "shirk[] her responsibilities."

Instead, because she intended to take medical leave due to her AVM, she was training other employees to perform her duties during her absence.

On July 13, 2011, Swanson again met with Barnhardt. Swanson reiterated her concerns about Barnhardt's performance and instructed Barnhardt to craft a performance improvement plan. Swanson warned Barnhardt that failure to make progress under the plan might result in the termination of her employment. At the meeting, Barnhardt attempted to discuss her illness and her intent to take medical leave, but Swanson refused to address the topic. On July 20, Swanson placed Barnhardt on probation for six weeks while implementing the performance improvement plan.

As part of her duties, Barnhardt organized weekly evening events for Open Harvest employees to discuss the history and philosophy of cooperatives. On July 28, at one of these events, Barnhardt criticized Swanson's management style and commitment to Open Harvest employees. She also characterized a committee created by Open Harvest management as a "divisionary tactic . . . put together as a distraction to create things that make the staff feel good, but the committee isn't really doing anything." The next morning, an Open Harvest employee informed Swanson of Barnhardt's remarks. When Swanson confronted Barnhardt about her comments, Barnhardt did not deny making them. Later that day, Barnhardt requested a meeting with Swanson to discuss taking medical leave.

Open Harvest claims that, on July 29, Swanson decided to terminate Barnhardt's employment, but she did not do so that day because she had decided to wait until Colleen Nygren, Open Harvest's finance manager, returned to the office the following week. Barnhardt worked for several hours on July 30 and took a sick day on August 1. When Barnhardt arrived at work on August 2, she was informed that her employment had been terminated. On August 3, Nygren emailed Open Harvest's outside financial advisor to determine whether Barnhardt's benefits, including her

short-term disability insurance, would continue for the remainder of August. In her email, Nygren stated that she wanted to continue Barnhardt's benefits coverage for the month of August if it was possible. Nygren erroneously stated that Barnhardt's employment had been terminated on August 1. The financial manager responded that the benefits would continue only if Barnhardt remained "on [Open Harvest's] books as an active employee." Nygren responded that Barnhardt would no longer be actively employed at Open Harvest. Nonetheless, Open Harvest deducted the short-term disability premium from Barnhardt's last paycheck—which included two weeks' severance pay—and did not forward the payment to Dearborn National. Open Harvest did not refund the deduction to Barnhardt until December 2011.

On September 15, 2011, Barnhardt filed a claim for short-term disability benefits with Dearborn National. In its letter denying benefits, Dearborn National stated that Open Harvest had terminated Barnhardt's coverage on July 31, 2011, and that Barnhardt had not become disabled until August 2, 2011. Because she became disabled after her coverage had terminated, Barnhardt was not entitled to benefits.

Barnhardt sued Open Harvest in Nebraska state court, bringing claims under ERISA, the Family Medical Leave Act, and state and federal age and disability discrimination statutes. Her ERISA claim alleged that Open Harvest knew that she would apply for disability benefits during her impending medical leave and for that reason sought to prevent her from obtaining those benefits. Open Harvest removed the case to federal court and moved for summary judgment on all claims. The district court granted Open Harvest's motion in full. Barnhardt appeals only the district court's entry of summary judgment on her ERISA claim.

## II. Discussion

We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party and giving that party the

benefit of all reasonable inferences. *Inechien v. Nichols Aluminum, LLC*, 728 F.3d 816, 819 (8th Cir. 2013). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in order to avoid summary judgment, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (quoting *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1207 (8th Cir. 2013)).

Section 510 of ERISA prohibits, among other things, an employer from discharging or discriminating against a participant in an ERISA plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. In order to recover under a § 510 interference claim, a plaintiff "must prove that [the defendant] possessed a 'specific intent to interfere' with her ERISA benefits." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1044 (8th Cir. 2010) (quoting *Pendleton v. QuikTrip Corp.*, 567 F.3d 988, 992 (8th Cir. 2009)). This specific intent to interfere means that the plaintiff's entitlement to ERISA benefits had "a determinative influence" on the defendant's decision. *Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 777 (8th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). A plaintiff can establish a § 510 interference claim either by direct evidence of a specific intent to interfere with ERISA benefits or through the *McDonnell Douglas* burden-shifting framework. *Manning*, 604 F.3d at 1042 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Barnhardt has not identified any direct evidence that Open Harvest acted with the specific intent to interfere with her ERISA benefits. "Direct evidence provides a strong causal link between the alleged discriminatory bias and the adverse employment action. It most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Scis.*,

559 F.3d 855, 861 (8th Cir. 2009) (internal citation omitted). Direct evidence "clearly points to the presence of an illegal motive." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Barnhardt has not identified any evidence of this sort showing a specific intent to interfere with her ERISA benefits. She contends that she has produced direct evidence of interference because Open Harvest's conduct was the sole reason that Dearborn National denied her benefits. But Barnhardt misunderstands the relevant inquiry. Direct evidence sufficient to support an ERISA interference claim would clearly show a *specific intent to interfere*, not merely *interference*. Many instances of interference—such as termination of ERISA benefits incident to an otherwise-permissible termination of employment—occur without giving rise to § 510 liability. *See Koons*, 367 F.3d at 779. "Otherwise, every employee discharged by a company with an ERISA plan would have a claim under § 510." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001).

Because Barnhardt has not identified direct evidence of a specific intent to interfere with her ERISA benefits, we must analyze her claim under the *McDonnell Douglas* burden-shifting framework.

> Under this framework, if a claimant is able to establish a prima facie case of a section 510 violation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. If the employer does so, then the burden shifts back to the claimant to prove that the proffered reason is pretextual.

*Manning*, 604 F.3d at 1042 (internal citations omitted). In order to establish a prima facie case of ERISA interference, a plaintiff must show that (1) the defendant subjected her to an adverse action; (2) she "was likely to receive future benefits" absent the adverse action; and (3) "a causal connection existed between the adverse action and the likelihood of future benefits." *Id.* at 1043-44. Barnhardt identifies two separate adverse actions on which her claim rests. First, she argues that Open Harvest

-6-

terminated her short-term disability coverage as of July 31, 2011, by failing to pay the August premium that was deducted from her final pay check. Second, she argues that Open Harvest interfered with her short-term disability coverage by terminating her employment on August 2, 2011. Under the terms of the Dearborn National policy, Barnhardt's short-term disability coverage would terminate on the date her employment was terminated. We analyze each of these adverse actions separately.

We turn first to Open Harvest's failure to pay the August premium to Dearborn National. Even if Barnhardt has satisfied her burden of establishing a prima facie case of ERISA interference founded on this omission, Open Harvest has offered a legitimate, non-discriminatory justification for its conduct. A defendant may act in good faith on a legitimate, non-discriminatory basis even if its rationale turns out to be incorrect. *See Koons*, 367 F.3d at 778 n.6; *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002-03 (8th Cir. 2012). Here, Open Harvest has explained its conduct as a good faith attempt to implement the terms of the ERISA plan. Swanson stated that she decided on July 29 to discharge Barnhardt. Barnhardt did not perform any work in the month of August because she called in sick on August 1 and was discharged upon arriving at work on August 2. After Barnhardt was discharged, Open Harvest's outside financial advisor informed Nygren that Barnhardt's benefits would continue for the month of August only if Barnhardt remained an "active employee." Based on this guidance and the fact that Barnhardt did not work at all during August, Nygren concluded that Barnhardt would not be entitled to short-term disability coverage for the month of August. This represents a reasonable interpretation of the Dearborn National policy. The policy provides that coverage terminates as of the date an employee's employment terminates. It further provides that an employee's "employment terminates" upon the "Cessation of Active Work." "Active Work means that an Employee is: 1. performing the normal duties of his occupation; and 2. working the minimum number of hours per week required by his employer." Based on these facts, Open Harvest reasonably could have concluded that Barnhardt did not actively work during the month of August and that her coverage

thus terminated as of July 31. While this interpretation might be incorrect, it constitutes a legitimate, non-discriminatory justification for Open Harvest's conduct. *See Koons*, 367 F.3d at 778 n.6; *Pulczinski*, 691 F.3d at 1002-03. We do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). Open Harvest has articulated a legitimate, non-discriminatory justification for its failure to pay the August policy premium to Dearborn National.

Under the *McDonnell Douglas* framework, the burden shifts back to Barnhardt to show a genuine dispute whether Open Harvest's justification is pretextual. She has not done so. In general, a plaintiff may show that a proffered justification is pretextual in two ways. *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 873 (8th Cir. 2008). First, the plaintiff may attack the factual basis underlying the proffered justification, thereby giving the jury a reasonable basis to doubt that the employer actually relied on that justification when it took its adverse employment action. *Id.* Second, the plaintiff may show that it is more likely that an impermissible motive caused the employer's action than that the permissible justification did. *Id.* In either case, the plaintiff "must point to 'enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005)).

Barnhardt has not pointed to any evidence that undermines the factual basis of Open Harvest's justification for failing to pay the August premium to Dearborn National. Nor has she identified evidence in the record suggesting that Open Harvest's conduct is more likely explained by a specific intent to interfere with her ERISA benefits than by Open Harvest's proffered reason. Instead, to the extent that she argues for pretext, Barnhardt relies entirely on her contention that Open Harvest

decided to discharge her and terminate her benefits only after she disclosed her AVM and her intent to take medical leave, which could have resulted in her receiving short-term disability benefits. She argues that the temporal proximity of her disclosures to Open Harvest's adverse actions permits the inference that the disclosures—and not Open Harvest's proffered justification—actually motivated the actions. But "timing alone is insufficient to show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 916 (8th Cir. 2006). We "look for proximity in conjunction with other evidence." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001). We have suggested that a plaintiff might satisfy this demand for "other evidence" by showing that her entitlement to benefits would impose ERISA-related costs on the defendant. *See Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1035 (8th Cir. 2007). But here, Open Harvest did not contribute any portion of the cost of short-term disability coverage. Even if Barnhardt had received benefits as a result of her AVM and associated medical leave, Open Harvest would not have sustained any additional costs. *See id.* (affirming summary judgment on ERISA interference claim where plaintiff could not show an "evidentiary link . . . between her termination and [her employer's] insurance costs"); *Benders v. Bellows & Bellows*, 515 F.3d 757, 766 (7th Cir. 2008) (affirming summary judgment on ERISA interference claim where employer "had no economic incentive to take the allegedly adverse action"). Barnhardt has not identified any admissible evidence other than temporal proximity that could show that Open Harvest's proffered justification for its conduct is pretextual. Therefore, she has not shown that there is a genuine dispute whether Open Harvest's failure to pay the August premium resulted from a specific intent to interfere with her ERISA benefits.

We turn next to the adverse action of terminating Barnhardt's employment. Even if Barnhardt can establish a prima facie case of ERISA interference founded on her discharge, Open Harvest has proffered legitimate, performance-related justifications for terminating her employment, and she has not shown a genuine

dispute whether these justifications are pretextual. Open Harvest identified substantial concerns with Barnhardt's performance, including her tardiness, unreasonably long lunch breaks, inappropriate comments to other employees, excessive delegation of her responsibilities, public criticism of Open Harvest management, and lagging membership in the cooperative. These concerns constitute legitimate, non-discriminatory justifications for discharging Barnhardt. *See Chambers v. Travelers Cos.*, 668 F.3d 559, 567 (8th Cir. 2012) (holding, in age discrimination case, that manager's "performance deficiencies" constituted legitimate, non-discriminatory basis for discharge); *Cameron v. Idearc Media Corp.*, 685 F.3d 44, 48-49 (1st Cir. 2012) (explaining that discharging employee for "poor performance in a job is a conventional business motive and not . . . purposeful interference under ERISA"). Barnhardt has not identified any facts in the record from which a reasonable jury could conclude that these performance-related justifications were pretextual. As explained above, the mere temporal proximity of her disclosures to her discharge does not permit the inference that Open Harvest's proffered justifications are pretextual. *See Green*, 459 F.3d at 916. Therefore, Barnhardt has not shown a genuine dispute whether Open Harvest terminated her employment with a specific intent to interfere with her ERISA benefits.

## III. Conclusion

For the foregoing reasons, we affirm the district court's entry of summary judgment in favor of Open Harvest.[2]

———————————————

———————————————

[2]We also grant Open Harvest's motion to strike Exhibits 3 and 4 from the record on appeal. The district court struck both of these exhibits, and Barnhardt did not appeal those rulings. As such, she may not rely on those exhibits. *See Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 970 (8th Cir. 1999).