# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 6, 2015         Decided July 14, 2015

No. 14-7055

LORIE A. GILES,
APPELLANT

v.

TRANSIT EMPLOYEES FEDERAL CREDIT UNION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01103)

*Richard P. Goldberg* argued the cause and filed the briefs for appellant.

*Neil S. Hyman* argued the cause and filed the brief for appellee.

Before: BROWN, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the court by *Circuit Judge* Brown.

Brown, *Circuit Judge*: Lorie Giles appeals the district court's grant of summary judgment to her former employer Transit Employees Federal Credit Union ("TEFCU") in this

wrongful termination case. Because no reasonable jury could infer TEFCU dismissed Giles because of the costs associated with insuring her, we affirm the district court's judgment.

I

Lorie Giles worked at TEFCU for almost four years. She began her tenure in December 2005 as a temporary employee and became a full-time receptionist in September 2006. After becoming a full-time employee, Giles enrolled in TEFCU's CareFirst BlueCross BlueShield ("CareFirst") health insurance. She selected the single employee, preferred provider organization ("PPO") plan known as the "Blue Preferred Option 1" plan. Giles suffers from Multiple Sclerosis ("MS") and as treatment received expensive monthly outpatient drug infusions from 2007 to October 2009. She took some sick leave to attend her medical appointments but had no prolonged absences.

In 2008, Giles was involved in a couple of altercations with TEFCU customers. On July 9, 2008, she adamantly insisted a customer return a pen, even as the customer explained it was actually his pen. Endia Robinson, TEFCU's Assistant Member Service Manager and one of Giles's supervisors, documented the incident and verbally warned Giles her behavior was unacceptable. On October 1, 2008, Giles confronted a customer for entering the building through the wrong door and attempted to make the customer exit and properly reenter. In response, Robinson issued a written warning and suspended Giles for two days without pay. In her performance evaluation for 2008, Giles received an overall rating of Partially Achieved Requirements ("PAR")—the second lowest of four possible ratings—and received a rating of Less than Expected ("LTE")—the lowest possible rating—for her specific receptionist duties. Giles's role at

TEFCU changed in October 2008 when she became a scanning specialist. In July 2009, Giles was again evaluated and received an overall rating of Fully Achieved Requirements ("FAR")—the second-highest rating. However she was given a PAR for her record maintenance tasks. Robinson noted Giles had improperly filed documents, stating "There is a large amount of documentation that is currently filed under the incorrect account number." J.A. 541.

During the time Giles was a participant in TEFCU's health insurance plan, TEFCU paid 80 percent of each participant's monthly premium, and the participants were individually responsible for the remaining 20 percent. CareFirst initiated a plan renewal and recalculated the premium rate annually. In doing so, it explained "renewal rates are calculated using the community claims experience and the average group age, projected forward with a health care inflation factor. In addition, factors such as prescription drug utilization, legislative mandates and provider utilization play key roles in determining health care costs." J.A. 344. From 2007 to 2009, the monthly premium for the Blue Preferred Option 1 plan rose. In August 2007, it went from $286 to $308 per month. In August 2008, the premium changed to $375 per month, and in August 2009 it increased to $449 per month.

In November 2009, Rita Smith replaced Percys Felder as TEFCU's chief executive officer ("CEO"). Smith terminated Giles on November 24, 2009. Giles did not exercise her right under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") to temporarily continue her health benefits, stating she could not afford to do so. Felder testified that beginning in May 2010, TEFCU used temporary employees and an intern to complete the scanning tasks Giles had previously performed. In July 2010, the monthly premium for

the single employee PPO plan decreased to $437 per month. After exhausting administrative remedies before the Equal Employment Opportunity Commission ("EEOC"), Giles filed this action in district court alleging wrongful termination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the District of Columbia Human Rights Act ("DCHRA"), D.C. CODE § 2-1401.01 *et seq.*, and Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140.[1] The thrust of Giles's claims is that the cost of treating her MS was causing the monthly premium for the Blue Preferred Option 1 plan to rise and that TEFCU dismissed her to reduce its health care costs.

After discovery, the district court granted TEFCU's motion for summary judgment, finding Giles failed to put forth sufficient evidence of her claims. *Giles v. Transit Emps. Credit Union*, 32 F. Supp. 3d 66, 68 (D.D.C. 2014). The district court further found that even if Giles's allegations were true, TEFCU had not violated the ADA. *Id.* at 73. The district court reasoned that terminating an employee for the costs associated with his or her health care is not termination for a disability. *Id.* Therefore, the district court explained, such a termination falls outside of the purview of the ADA, which forbids terminations motivated by an employee's disability. *Id.* Finally, the district court denied Giles's motion for discovery sanctions, in which she claimed any inadequacies in the evidence were caused by "TEFCU's spoliation of health-insurance invoices and communications."

---

[1] Giles filed her suit *pro se* and initially raised only the ADA claim. After the district court appointed *pro bono* counsel, Giles amended her complaint to include the DCHRA and ERISA claims. She also raised a claim of wrongful discharge in violation of public policy, which the district court dismissed on October 10, 2012 and is not at issue here.

*Id.* at 74 n.3. The motion was moot in light of the sufficient documentation of TEFCU's health insurance premiums, which was provided by CareFirst. *Id.* This appeal followed.

II

We review the district court's grant of summary judgment *de novo*. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1225 (D.C. Cir. 2008). Summary judgment is warranted "only if, viewing the evidence in the light most favorable to [Giles] and giving [her] the benefit of all permissible inferences, we conclude that no reasonable jury could reach a verdict in [her] favor." *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009).

Under the ADA, no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees . . . and [the] privileges of employment." 42 U.S.C. § 12112(a). The DCHRA similarly forbids covered employers from terminating any individual "wholly or partially for a discriminatory reason based upon the actual or perceived . . . disability . . . of any individual." D.C. CODE § 2-1402.11(a). When evaluating claims brought under the DCHRA, "decisions construing the ADA [are considered] persuasive." *Grant v. May Dept. Stores Co.*, 786 A.2d 580, 583–84 (D.C. 2001); *see also Hunt v. District of Columbia*, 66 A.3d 987, 990 (D.C. 2013) ("Our decisions under the DCHRA . . . effectively incorporate judicial construction of related anti-discrimination provisions of the [ADA]."). To demonstrate discrimination in violation of the ADA or the DCHRA, the plaintiff "must prove that he had a disability within the meaning of the ADA, that he was 'qualified' for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his

disability." *Duncan v. Washington Metro Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (internal quotation marks omitted).

Pursuant to Section 510 of the ERISA, it is unlawful, *inter alia*, to "terminate an employee either in retaliation for using a qualified employee health plan or in order to interfere with the employee's use of that plan." *Gioia v. Forbes Media LLC*, 501 F. App'x. 52, 54 (2d Cir. 2012) (summarizing 29 U.S.C. § 1140). To prevail on a Section 510 claim, a plaintiff must demonstrate the employer specifically intended to engage in prohibited activity. *Barnhardt v. Open Harvest Cooperative*, 742 F.3d 365, 369 (8th Cir. 2014). "[N]o action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination." *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990). "Otherwise, every employee discharged by a company with an ERISA plan would have a claim under § 510." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001).

In a case such as this, where the plaintiff lacks direct evidence of discrimination, ADA, DCHRA, and ERISA claims are each evaluated under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Adeyemi*, 525 F.3d at 1226 (applying *McDonnell Douglas* framework to an ADA claim); *Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights*, 917 A.2d 1094, 1102 (D.C. 2007) ("In reviewing discrimination cases under the [DCHRA], we apply the familiar burden-shifting test set forth by the Supreme Court in *McDonnell Douglas* . . . ."); *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (observing "[c]ourts of appeals routinely apply the same standards to evaluate Title VII claims as they do ADA claims, ADEA claims, and even

ERISA claims.") (citation omitted); *Barnhardt*, 742 F.3d at 369 ("A plaintiff can establish a § 510 [ERISA] interference claim either by direct evidence of a specific intent to interfere with ERISA benefits or through the *McDonnell Douglas* burden-shifting framework."); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988) ("[T]he *McDonnell Douglas* presumptions and shifting burdens of production are . . . appropriate in the context of discriminatory discharge cases brought under § 510 of ERISA.").

Under the framework, the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). The burden then shifts to the employer to set forth a legitimate, non-discriminatory reason for the challenged action. *Id.* However, as we explained in *Brady v. Office of Sergeant at Arms*, at the summary judgment stage, "once the employer asserts a legitimate, non-discriminatory reason [for its challenged action], the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (alteration in original)). At that point, the only remaining question is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi*, 525 F.3d at 1226; *see also Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (stating that after the employer asserts a legitimate, non-discriminatory reason for its action, "we proceed directly to the heart of the matter").

8

III

A

Here, TEFCU asserted a legitimate, non-discriminatory reason for terminating Giles: she was a poor employee. TEFCU points to Giles's 2008 performance review, in which she received a LTE for her specific duties as a receptionist after being involved in altercations with members. TEFCU claims it moved Giles to the scanning position to minimize her interaction with customers. Felder, who served as TEFCU's CEO at the time Giles's position was changed, testified that Giles had not been a good employee and that Felder decided to change Giles's role in an effort to "keep her on board" instead of firing her. J.A. 77. TEFCU next cites Giles's 2009 performance review, explaining Giles was rated only a PAR for duties associated with the scanning position and that the evaluation identifies several mistakes Giles made including improperly indexing work and incorrectly recording documents.

Smith and Felder testified that shortly after Smith took the helm on November 19, 2009, the two had a conversation in which Felder recommended Smith fire certain employees, including Giles. Felder stated she had considered Giles's past performance reviews before recommending that she be let go. Felder testified that she and Smith discussed both Giles's past performance, which Felder considered to be inadequate and below average, and a mistake Giles made in which documents were scanned to the wrong customers' accounts. Felder could not recall the precise timing of this mistake, and during her deposition she first posited that it took place in the weeks leading up to Giles's termination in November 2009 but later speculated it came to light during the second quarter of 2009. Recounting the discussion with Felder, Smith said the two

decided Giles would not "work out long term with TEFCU" and that Felder's account of Giles's scanning mistake was what "vividly st[uck] out" to her. J.A. 230. Smith decided to terminate Giles and informed her on November 24, 2009.

B

Given TEFCU's proffer, we turn to whether Giles "produced evidence sufficient for a reasonable jury to find that [TEFCU's] stated reason was not the actual reason" and that the decision to dismiss Giles was actually motivated by a perception that the health insurance claims related to her MS treatment were causing the premium to increase. *Brady*, 520 F.3d at 495. In doing so, we consider "all relevant evidence" presented by both Giles and TEFCU. *Id.*

Giles argues she was not a poor performer and therefore TEFCU's asserted reason for her termination is pretext. She claims her move to the scanning specialist position was actually a promotion. Further, she points to her July 2009 performance review in which she received an overall rating of FAR, the second-best rating. In some cases, a positive evaluation is inconsistent with an employer's assertion of poor performance and therefore suggests pretext. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728 (8th Cir. 2001) ("A history of positive performance evaluations can be powerful evidence of satisfactory performance."). Here, however, the review is consistent with Felder and Smith's testimony that Giles performed the record maintenance duties associated with her scanning specialist position inadequately, despite her overall high rating. TEFCU was free to dismiss Giles based on these perceived performance deficiencies, and courts do not serve as "super-personnel department[s] that reexamine[]" whether such a decision was wise, sound, or fair. *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

Giles relies on the sworn statement of Stefan Bradham, who worked for TEFCU at the same time as she.[2]  Bradham said Giles's "performance was consistently very good throughout 2009."  J.A. 551.  Giles does not allege, however, that Bradham had a role in deciding whether she should continue as a TEFCU employee.  Nor does Bradham claim to have communicated his positive view of Giles's performance to Felder or Smith.[3]  His statement is therefore of exceptionally limited relevance.  *Cf. Vatel v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (explaining that in evaluating whether an employee's asserted reason is pretext, "it is the perception of the decision maker which is relevant") (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)); *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[T]hat plaintiff's coworkers 'may have thought that [she] did a good job, or that [she] did not 'deserve' [to be discharged], is close to irrelevant.'") (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir. 1991) (alterations in original)).  Bradham's statement does not demonstrate the key players in the decision—Smith and Felder—actually believed Giles performed her duties adequately, and there is ample evidence for a reasonable jury to conclude they did not.

Giles also denies that she filed documents to the incorrect TEFCU customers' accounts, the error Felder and Smith claimed weighed heavily in the decision to terminate her.

---

[2] Whether Bradham was one of Giles's supervisors is a disputed fact.  Giles asserts he was, but TEFCU argues to the contrary and points to Giles's deposition testimony in which she stated she was supervised by Percys Felder, Tanya Billups, George Davis, Endia Robinson, and Alicia Brown, with no mention of Bradham.

[3] To the contrary, a May 12 2009 email from Shirley Broder, TEFCU's human resources consultant, and Felder stated "Stefan is having some issues with [Giles's] performance . . . ."  J.A. 1225.

While Felder testified she could not recall the precise timing of the alleged mistake, Giles clings to Felder's speculation it could have occurred in the weeks leading up to Giles's termination. She then argues a lack of documentation of the incident suggests it did not happen. Felder indeed testified the incident was documented in an e-mail and said TEFCU procedures would require the incident to be documented on a paper that Giles would have been asked to sign. Documentation of a scanning mistake in the weeks immediately before Giles's termination does not appear in the record.

But Giles ignores the portion of Felder's testimony in which she also surmised the mistake could have been discovered in the second quarter of 2009. This undermines Giles's position because a documented incident that corroborates Felder's testimony is part of the record. In Giles's July 2009 performance evaluation, Robinson noted, "There is a large amount of documentation that is currently filed under the incorrect account number. It is important that this does not continue to happen because it makes account research much more difficult and defeats the purpose of us scanning the documents." J.A. 541. Giles cannot create a dispute of material fact by distorting testimony and then complaining of a lack of documentation to support her garbled narrative.

Next, Giles relies on Bradham's declaration that he was, "aware of no serious mistake that Ms. Giles made in her scanning duties in 2009" and that he does "not believe that such a mistake took place." J.A. 551. Bradham explains he did not receive "an e-mail or other written notice or documentation" of any serious scanning mistake. J.A. 551. But Bradham cites the July 2009 performance evaluation as proof of Giles's good work performance, and that same

evaluation noted Giles had improperly filed scanned documents.

Even if a jury were to credit Bradham—perhaps by inferring either that he did not believe the scanning error actually occurred despite its documentation in the evaluation or that he did not believe it was "serious"—his statement does not reach the heart of the issue: whether *Felder and Smith* believed Giles had made a mistake at the time Smith decided to dismiss her. *See Brady*, 520 F.3d at 495 ("[A]n employer's action may be based on a good faith belief, even though the reason may turn out in retrospect to be mistaken or false.") (quoting 1 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 8.04, at 8-73 (2d ed. 2007) (alteration in original)). While Giles has set forth no evidence suggesting Felder and Smith did not think the error occurred or that it was not significant, Felder's testimony that she reviewed Giles's performance evaluations before recommending she be terminated and the notation in the July 2009 evaluation of the improper filing, which described the error as significant provide abundant grounds for a reasonable jury to conclude they did.

Giles further attempts to discredit TEFCU's asserted reason by showing TEFCU's explanation of her termination has varied over time. "[S]hifting and inconsistent justifications are 'probative of pretext.'" *Geleta v. Gray*, 645 F.3d 408, 413–14 (D.C. Cir. 2011) (quoting *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001)); *see also Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual.").

In a January 2010 statement submitted to the EEOC, TEFCU noted Giles's PAR rating for her scanning specialist

duties in the July 2009 performance review and catalogued Giles's altercations with customers. It then stated the decision to lay off Giles was "part of a general organizational review" and was "made for business reasons only, as the duties for which Ms. Giles was primarily responsible no longer require a full-time TEFCU employee." J.A. 554. In its motion for summary judgment filed below, TEFCU maintained it dismissed Giles because she was performing poorly and because eliminating substandard employees was part of a strategy TEFCU was pursuing at the time to cut costs and restore the company to profitability. On appeal, TEFCU asserts only that Giles was terminated because she was a poor employee with Felder and Smith stating the scanning mistake was the most important performance issue**.**

Over time, TEFCU went from arguing before the EEOC that the decision to terminate Giles was made only for a non-performance related reason to now claiming poor performance is the sole reason. Further, TEFCU did not abandon its claim of a cost-cutting reorganization until after Smith was deposed and specifically denounced such a rationale. A reasonable jury could find TEFCU's explanations to be inconsistent and suspicious and determine TEFCU's most recent justification is "unworthy of credence." *Reeves*, 530 U.S. at 143. In granting Giles all permissible inferences, we find therefore she has made a sufficient—albeit weak—rebuttal from which a reasonable jury could conclude TEFCU's asserted reason is not the real reason she was terminated.

Giles maintains that if a reasonable jury could disbelieve TEFCU's proffered explanation, we must reverse the district court's grant of summary judgment. While "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext," *Geleta*, 645 F.3d at 413–

14 (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996)), there are "instances where, although the plaintiff has . . . set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc) ("[I]n some instances . . . the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination."). This is because "the plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case." *Aka*, 156 F.3d at 1292; *see also Reeves*, 530 U.S. at 148–49 ("Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered . . . .").

A jury may reasonably disbelieve TEFCU's assertion that Giles was terminated solely for poor performance with a specific emphasis on a scanning mistake, but no reasonable jury could conclude the real reason for her discharge was that TEFCU believed her medical expenses were driving up the insurance premium. There is simply no evidence Giles's insurance claims had any effect on the premium or that Smith or Felder thought they did or could. The record therefore does not permit an inference that the cost of insuring Giles was a motivating factor in the decision to terminate her.

First, TEFCU argues it did not know—and had no way of knowing—what Giles's treatments cost. As TEFCU was not self-insured, CareFirst paid Giles's medical bills. TEFCU

claims—and Giles does not dispute—that privacy laws forbade it from receiving information about the amount of employees' health insurance claims. Consistent with this argument, there is no evidence that any person associated with TEFCU investigated or reviewed the costs of Giles's treatment or those of any other individual. *Cf. Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008) (self-insured employer received "stop-loss reports" identifying employees with high claims); *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1152 (10th Cir. 2008) (self-insured employer reviewed health care costs and designated certain claims as "high-dollar"). Giles relies on Felder's acknowledgement that Giles told her the infusion treatments were "costly." J.A. 118–19. That Felder had some general awareness Giles was receiving "costly" medical treatment does not demonstrate Felder thought the treatments were so costly as to be a concern to TEFCU.

Further, Giles lacks evidence supporting her contention that the costs of her medical treatment caused CareFirst to raise the monthly premium for the Blue Preferred Option 1 plan. She relies heavily on language contained in the letter CareFirst sent to TEFCU each year regarding the renewal process stating "factors such as prescription drug utilization, legislative mandates and provider utilization play key roles in determining healthcare costs." J.A. 344. However, the premium for the Blue Preferred Option 1 plan was calculated using a community rating methodology[4] and therefore derived from the claims experience of not just TEFCU but from "all

---

[4] Generally, a "[c]ommunity rating establishes premiums for uniform benefit programs based on the average cost of all insureds in a given geographic area. . . . Some modified forms of community rating permit the recognition of the age and sex of the members of groups that it covers." 2 JEFFREY D. MAMORSKY, EMPLOYEE BENEFITS HANDBOOK § 46:80 (2014).

small groups located in the District of Columbia area with fewer than 51 contracts." *Id.* The vague language referenced by Giles in no way explains whether or how the treatment costs of *a single individual* in the community market could significantly impact the premium.

What is more, Giles failed in this litigation to establish the amount of her medical expenses. She testified her monthly infusion treatments were "a little over $4,000 each time." J.A. 834. However, she did not submit documentation, such as the explanation of benefits, to establish the precise cost of the infusions. Nor did Giles present evidence as to any other costs associated with her medical treatment. Without a precise number, it would be difficult for a jury to weigh and assess her claims.

Even if it was possible for one individual's claims to dramatically affect the premium, Giles provides a reasonable jury with no cause to believe the fluctuations in the premium should be attributed to her medical expenses. She relies on the fact that the premium decreased—from $449 per month to $437 per month—after she was no longer employed by TEFCU as evidence that her health care costs prompted the previous increases. Giles's equation of correlation with causation is too obviously flawed to be accepted by a reasonable jury. While Giles states her medical expenses were high, she never claims her costs were the highest or even among the highest in the community market. In other words, she makes no attempt to isolate her own claims as the cause of the fluctuations in the premium, as opposed to those of others. Indeed, Giles does not even claim her medical expenses were the highest *among TEFCU employees* enrolled in a CareFirst insurance plan. Such a claim seems necessary to her argument, because the removal of Giles was far from the only change to TEFCU's enrollment list before the premium

decreased. For example, in August 2009, there were nine TEFCU employees enrolled in the single employee PPO plan. By July 2010, there were eleven, of which only four had been on the plan in August 2009. Giles fails to distinguish herself from any of the other individuals added or removed.

However, the record does support the conclusion that the lower premium in 2010 is attributable to a change in the substance of the plan and not to its enrollees. As TEFCU points out, the single employee PPO plan offered by CareFirst in the 2010–2011 renewal letter—Option 6—was different than Giles's plan—Option 1. The premium for the Option 6 plan was slightly lower, but it called for higher co-pays and higher deductibles than had been charged under Option 1. On the record before us, Giles's assertion that the rising plan premium during the time of her employment and the decrease that occurred after she was laid off should be attributed to the cost of her medical treatment is simply untethered speculation.

Even if Giles had demonstrated her medical costs were or could have been the cause of the premium increases, no evidence suggests Smith or Felder thought so. Giles points to testimony by Felder that Shirley Broder, a human resources consultant for TEFCU, advised Felder not to hire Giles as a permanent employee because of her MS. Supposing Felder's testimony could somehow be interpreted to suggest Broder's specific concern was that Giles's medical costs would drive up the premium, the fact remains that Felder did not follow Broder's advice and hired Giles with full awareness of her condition. Nothing in the record links any discriminatory animus Broder may have harbored at the time Giles became a full-time employee in 2006 to Giles's termination three years later. Giles points to Felder's knowledge that her treatment was "costly," but that awareness in no way suggests Felder

believed Giles's expenses caused or could have caused the premium to go up.

Furthermore, there is no suspicious temporal connection from which a jury could infer TEFCU's reason for terminating Giles was associated with her medical expenses. *See Trujillo*, 524 F.3d at 1157 (temporal proximity between employees' son's relapse and the initiation of an investigation of alleged time theft that led to their termination contributed to "an inference of discrimination"); *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999) (holding the plaintiff's "termination followed so shortly after his claim to medical benefits that the jury could reasonably infer a retaliatory motive"). Giles had been receiving the infusion treatments consistently for two years by the time she was laid off. And while she argues generally that Felder was aware her condition and physical symptoms were worsening and necessitated more visits to her doctor, she does not suggest there was any significant corresponding increase in the expense of her treatment[5] or that any specific event would have led Felder to believe there was. Moreover, Giles admits that no one from TEFCU ever initiated a conversation with her about her health care costs—not in close proximity to her termination or any other time. *See, e.g.*, *Gaglioti v. Levin Group, Inc.*, 508 F. App'x 476, 484 –85 (6th Cir. 2012) (granting summary judgment for employer where there was no evidence of concern about the cost of coverage or a discussion of the costs including no evidence of conversations about the costs); *Dewitt*, 517 F.3d at 948 (denying summary judgment for employer where it asked the employee about

---

[5] In fact, she admits she stopped receiving the infusion treatments in October 2009. There is no evidence, however, TEFCU was aware of this change.

high costs of her husband's treatment twice in the five months preceding her termination).

Giles argues TEFCU was looking to reduce the amount it spent on employee health insurance at the time she was dismissed, suggesting her termination was related to her medical expenses. She points to a statement by Felder that as CEO she has been concerned with how health insurance costs affected TEFCU's "bottom line." J.A. 105. In our era of ever-escalating health care costs, however, it is inconceivable that a CEO would not have at least some background concern regarding the impact of those costs on the business' books. *Accord Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980–81 (5th Cir. 1993). There is evidence, moreover, suggesting TEFCU was not actively on a campaign to reduce health care costs when Smith decided to dismiss Giles. Smith testified that in November 2009, that year's health insurance contract was already in place and that she would not make any decisions regarding health insurance until the next renewal.

Giles next claims TEFCU "forced" a rate renewal earlier in the year than the previous renewals, which had each become effective August 1, and that this is evidence of TEFCU's desire to receive a lower rate in light of Giles's termination. Despite her accusation, Giles pinpoints no evidence to this effect. CareFirst sent the 2010-2011 renewal notice in June, just as it had the previous relevant renewal notices. While the new premium rate was effective by July 2010, Giles cites no evidence explaining the timing of the effective date or suggesting it occurred earlier than in previous years at TEFCU's behest. Giles also points to Smith's testimony that, in 2011, TEFCU changed its policy and began to require employees enrolled on *family* insurance plans to pay 50 percent of the monthly premium instead of 20. This change would not have affected Giles, who was enrolled

on a *single individual* plan, and occurred more than a year after she left. It therefore does not imply TEFCU was concerned with the rising premium for Giles's plan at the time it terminated her in 2009.

Giles's last argument to this effect is that the fact that her scanning duties were assumed by temporary employees—who were not eligible to enroll in TEFCU's health insurance— supports an inference that TEFCU terminated her as part of a plan to cut insurance expenses. Giles credits Felder's testimony that two temporary employees and one intern took over the scanning duties. However, Giles disregards the rest of Felder's testimony on this issue, which takes much of the wind out of the argument that TEFCU's switch to temporary employees was pernicious. Felder explained temporary employees and interns had performed the scanning duties at TEFCU before Giles took on the role of scanning specialist in October 2008. Further, Felder's testimony reveals a significant lapse in time between Giles's dismissal and the hiring of the temporary employees and intern, whose start dates were May 6, June 21, and September 2, 2010.

Finally, this is not a case "premised upon evidence in the record from which a reasonable juror could find that, absent invidious discrimination, the challenged employment decision was inexplicable." *Barbour v. Browner*, 181 F.3d 1342, 1346–47 (D.C. Cir. 1999); *see also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration . . . ."). Instead, in uncontroverted testimony, Felder and Smith stated that in addition to Giles, two other employees severed ties with TEFCU on November 24, 2009.

Smith and Felder explained Theresa Boyd was slated to be dismissed that day, but she resigned instead. They further stated Bradham was terminated on November 24, 2009, and Bradham's declaration confirms that is the day his tenure at TEFCU ended. Smith explained Bradham was not replaced with a new employee and that instead Smith mostly took over his duties. As for Boyd, her name does not even appear on CareFirst's invoices listing TEFCU employees enrolled in its health insurance plans. Instead, Smith and Felder testified that as Felder passed the CEO baton to Smith, she recommended Boyd, Bradham, and Giles be terminated because they would not "fit into [Smith's] management style." J.A. 60. While Felder's style was "laid back," Smith's was "aggressive." *Id.* at 61. Smith confirmed she accepted Felder's recommendations and that she specifically chose to terminate Giles because she would not tolerate poor performance.

"[W]e do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks omitted). But an employer is entitled to summary judgment where "the plaintiff created only a weak issue of fact as to whether the employer's reason [for the termination] was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination [has] occurred." *Reeves*, 530 U.S. at 148 (citing *Aka*, 156 F.3d at 1291–92). This is such a case. Giles rebutted TEFCU's asserted reason for her termination by highlighting its inconsistencies with TEFCU's previous explanations. Giles thereby showed a jury could reasonably discredit TEFCU's explanation, but her rebuttal is weak and did not undercut poor performance as a possible reason for her termination. Instead, TEFCU submitted uncontroverted

evidence that two other employees were recommended for termination on the same day as Giles, and there is no suggestion this recommendation was based upon the other two employee's health status or their impact on insurance costs. The timing and circumstances of Giles's termination also strongly corroborate the evidence that Smith relied upon Felder's recommendations, making the decision to terminate Giles because—as with the two other employees—her performance would not comport with Smith's management style. Moreover, the evidence submitted by Giles is exceedingly weak, as she failed to establish either that her medical expenses were in fact causing the dramatic rise in the premium or that Smith or Felder thought they were. *See id.* at 149 (explaining "whether judgment as a matter of law is appropriate" depends on, *inter alia*, "the strength of the plaintiff's prima facie case"). We conclude that on this record no reasonable jury could find TEFCU terminated Giles because of the costs associated with insuring her, as an individual with MS. Therefore, the district court's grant of summary judgment to TEFCU was proper.

IV

The district court distinguished between the disability discrimination claims under the ADA and the DCHRA and the retaliation for use of medical benefits claim under ERISA. In granting summary judgment to TEFCU on the ADA and DCHRA claims, the district court found Giles's "argument concedes that [TEFCU] terminated her to save health care costs, and not because she was disabled."[6] *Giles*, 32 F. Supp. 3d at 73 (quoting *Tramp v. Associated Underwriters, Inc.*, No. 8:11CV371, 2013 WL 3071258 (D. Neb. June 17, 2013)).

---

[6] TEFCU does not dispute that Giles's MS is an ADA qualifying disability.

*See also Dewitt*, 517 F.3d at 953 (Posner, J., concurring) (arguing there is no "*disability* discrimination" where an employer terminates an employee because of medical expenses and that employer would "discriminate against any employee who[] . . . ran up a big medical bill" regardless of whether the expenses were "due to a condition that did not meet the statutory definition of a disability"). On appeal, Giles argues the district court erred and termination based on the cost of an employee's disability violates the ADA. Appellant's Br. 46–47 (citing, *inter alia*, *Pamythes v. City of Janesville*, 181 F. App'x 596 (7th Cir. 2006) (holding a plaintiff who claimed to have been discharged because of the cost of treating his cystic fibrosis had shown sufficient evidence of pretext to preclude summary judgment on his ADA and Rehabilitation Act claims); *Fraturro v. Gartner, Inc.*, 2013 WL 160375, *12 (D. Conn. Jan 15, 2013) (stating a reasonable jury could infer "anti-disability animus was a motivating factor in the decision to terminate" the plaintiff where the employer had an "admitted desire to reduce health insurance costs arising from chronic illnesses")); *see also Trujillo*, 524 F.3d at 1160–61 ("[T]he Trujillos provided sufficient evidence that the decision to terminate them was based on discriminatory intent to violate the ADA. That evidence also supports an inference that their discharge was motivated by an intent to interfere with their ERISA benefits."). TEFCU does not provide an argument in support of the district court's ruling.

We find it unnecessary to reach the issue. Even assuming discrimination based on the costs associated with insuring a person with a disability is discrimination on the basis of the disability, Giles's ADA and DCHRA claims cannot survive TEFCU's motion for summary judgment for the reasons discussed above. Therefore we need not and do not address

the question of whether Giles's allegations could properly form the bases of ADA and DCHRA claims.

V

Lastly, Giles appeals the district court's denial of her motion for discovery sanctions. The district court may sanction a party for "fail[ure] to obey an order to provide or permit discovery." FED. R. CIV. P. 37(b)(2). Under Rule 37, the district court has "broad discretion to respond, or not to respond, to alleged abuses of the discovery process." *Exum v. Gen. Elec. Co.*, 819 F.2d 1158, 1164 (D.C. Cir. 1987); *see also Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 689 (D.C. Cir. 1987) (describing the district court's discretion as "considerable"). When reviewing the district court's denial of sanctions, the question is not whether we would have ordered sanctions, but instead is whether the district court abused its discretion in declining to do so. *See Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 642 (1976); *see also Conseil Alain Aborudaram, S.A. v. de Groote*, 460 F.3d 46, 52 (D.C. Cir. 2006).

The district court concluded Giles's motion for sanctions was "moot" as to the documentation of TEFCU's insurance costs, reasoning Giles had not raised her "ERISA claim until three years after her termination" and therefore "there was no reason why the litigation hold should have covered all documents related to the company's health insurance costs." *Giles*, 32 F. Supp. 3d at 74 n.3. Regardless, the district court found Giles's objections moot, because she had received sufficient evidence of the insurance premium rates from CareFirst. *Id.* It then found no other ground for imposing sanctions. *Id.* Giles asks us to reverse this decision. While Giles reiterates the reasons for her request for discovery sanctions, she provides no citation to authority or to the

record demonstrating the district court's denial of her request was premised upon an erroneous conclusion of law, an erroneous factual finding, or that it was otherwise unreasonable. *Cf. Fencorp, Co. v. Oh. Ky. Oil Corp.*, 675 F.3d 933, 942 (6th Cir. 2012). We therefore find no showing of an abuse of discretion and affirm the district court's denial of Giles's motion for sanctions.

## VI

For the foregoing reasons, the district court's judgment is affirmed.

*So ordered.*