FILED
United States Court of Appeals
Tenth Circuit

May 7, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

WILLIAM TRUJILLO; DEBRA
TRUJILLO,

       Plaintiffs-Appellants,

v.

PACIFICORP, an Oregon corporation,

       Defendant-Appellee.

No. 06-8074

---

**Appeal from the United States District Court
for the District of Wyoming
(D.C. No. 05-CV-321-CAB)**

---

Sharon M. Rose of Lavery & Rose, P.C., Evanston, Wyoming, for Plaintiffs-
Appellants.

Richard D. Bush (Paul J. Hickey with him on the brief) of Hickey & Evans, LLP,
Cheyenne, Wyoming, for Defendant-Appellee.

---

Before **TACHA**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

William and Debra Trujillo brought this action against PacifiCorp claiming their employment with PacifiCorp was terminated in violation of the association clause of the Americans with Disabilities Act (ADA), 42 U.S.C. §12112(b)(4), and the Employee Retirement Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* The district court granted PacifiCorp summary judgment on both claims. We reverse.

## I

William and Debra Trujillo were employed by PacifiCorp at the Jim Bridger Power Plant in Sweetwater County, Wyoming.[1]  Mr. Trujillo's tenure with PacifiCorp lasted over twenty-five years while Mrs. Trujillo was employed by the company for eight years.  As employees, the Trujillos participated in the employer provided health insurance plan.  The Trujillos' son, Charlie, was also covered by the plan.  Charlie suffered from a brain tumor which later metastasized to his spine.  The Trujillos used their available health insurance benefits to cover the treatment of their son.  It is unclear from the record when it was first discovered Charlie had a brain tumor, but he suffered a relapse on May 30, 2003, and was deemed to be in the final stages of cancer.  Charlie's medical care providers recommended aggressive experimental treatments to reverse the progression of the disease.  Treatment began immediately.  In six weeks,

---

[1]As is required by FED. R. CIV. P. 56, we review the evidence in the light most favorable to the Trujillos.

Charlie's medical bills exceeded $62,000. Charlie died in 2004.

PacifiCorp employees at both the local and corporate level were aware of Charlie's condition, his relapse, and his need for experimental treatment. Being a self insured company, insurance claims for Charlie's healthcare were paid directly by PacifiCorp. As with most modern businesses, healthcare costs were a concern at the local and corporate level. It was understood at the plant that a small percentage of employees with catastrophic injuries drive health care costs up. One executive commented that 90% of all healthcare costs were incurred as result of only 10% of the employees. Charlie was one of only two people with a terminal illness during the relevant time period.

Demonstrating the company's keen eye on costs, healthcare costs for each employee were factored into the plant's budget line item for labor costs. Bob Arambel, the plant manager, testified that employees were being asked to foot more of the bill for health insurance. As a result, the labor union and the company would meet annually to review the past year's health care claims and claims experiences, and to discuss cost sharing by increasing employee premiums. In fact, healthcare costs were of such concern that, just before Charlie's relapse, the company asked the state of Wyoming for a utility rate increase. In part, the company justified its request on significantly increased healthcare costs.

PacifiCorp designated claims of over $50,000 as high-dollar ones. Charlie's medical expenses during his relapse exceeded that figure by at least

$12,000. On June 10, 2003, just eleven days after Charlie's relapse, the company began an investigation into suspected time theft by the Trujillos. The investigation resulted in the termination of the couple. The plant manager, Bob Arambel, as well as two other managers from the labor relations group, participated in the decision to terminate them.

The investigation of the Trujillos focused on time allegedly falsely reported during a planned outage. During an outage, one of the plant's turbines would undergo regularly needed maintenance. When this additional activity occurred, the normal routine of the plant changed and the employees' hours and supervisors changed. Employees worked on specialized crews and often worked overtime to complete the turbine maintenance quickly.

To record their time at the plant, the Trujillos kept time sheets, as did other employees. Because there was not a time clock requiring employees to punch in and out during a shift, supervisors verified and approved time kept based on their observations of employees during the workday. Although time sheets were supposed to be turned in and reviewed at the end of each day, supervisors did not always follow this procedure. Sometimes, employees filled out time sheets well after the dates worked. Similarly, so that time could be determined for a certain pay period, sometimes employees were asked to fill out time sheets in advance. In addition, supervisors and foremen sometimes permitted employees to leave early but record a full shift. Each supervisor had his own method of managing

time sheets and the time he permitted employees to record.

Traffic and pedestrian gates are located at the perimeters of the plant. The gates were not intended as a method of keeping track of hours worked, but rather as a security measure. To access the gates, employees were required to use a personal identification card to open the gates or to sign in and out as they went through the gates. Employees often entered and exited the security gates with another employee, however, in which case only one employee would swipe their card to open the gates. This practice was known as piggybacking. Despite the gates' security purpose, their use by every employee during each entry and exit was not strictly enforced.

The investigation of the Trujillos was conducted by Larry Cundick, one of Mr. Trujillo's regular supervisors, Paul Fahlsing, Mr. Cundick's supervisor, and Rick Jones, a labor relations consultant at the plant. Mr. Cundick began the investigation after he was asked to sign Mr. Trujillo's timesheets on behalf of one of his supervisors during the outage. Although the security gates had not previously been used to verify time sheets, Mr. Cundick decided to compare Mr. Trujillo's time sheets with the security gate log's list of entries and exits. He found that for the period of May 27 through June 10, 2003, the time cards and gate logs showed discrepancies. Because Mr. and Mrs. Trujillo often carpooled to work, PacifiCorp assumed the couple would be at work at the same times. On that assumption, PacifiCorp also compared Mrs. Trujillo's time sheets and gate

records with her husband's time sheets and gate records. Time and gate records of spouses had not been previously used to verify individual employee work hours. The comparison revealed there were times when one spouse was there and the other was not. Further discrepancies were found between Mrs. Trujillo's individual time sheets and gate logs. Thus began the investigation of both Trujillos.

Mr. Trujillo was contacted on June 10 regarding the time discrepancies revealed by the comparison of his time sheets to the security gate logs and to his wife's time sheets and gate logs. While Mr. Trujillo could explain some of the problems with his time sheets, he generally could not recall whether he was working or not during times for which he was asked to account. He informed management employees that due to his son's condition and his own mental health, he was under a severe amount of stress. Three days after the initial meeting, PacifiCorp contacted him again. During this meeting, Mr. Trujillo's mental health was discussed.[2] Mr. Trujillo disclosed that he was taking anti-depressant medications and was attempting to get additional mental healthcare but that his doctor was not available for another two weeks. No specific discussion of alleged time theft incidences is evidenced in the record.

On June 19, 2003, PacifiCorp sent Mr. Trujillo a termination letter citing a

---

[2]During the relevant time period Mr. Trujillo was suffering from severe depression and other mental health problems.

total of ten incidents of time theft. As reason for Mr. Trujillo's termination, Pacificorp alleged Mr. Trujillo intentionally falsified time records to show that he worked 21.1 hours of regular time and six hours of overtime for the time period of April 23 through May 29, 2003.

Bob Arambel testified that the decision to terminate Mrs. Trujillo was made at approximately the same time as the decision to terminate Mr. Trujillo. Prior to the decision to terminate Mrs. Trujillo, the company had spoken with her only once regarding time sheet discrepancies. In that telephone call, while Mrs. Trujillo was attending to her son in a Denver hospital, she was asked to explain time discrepancies as far back as April 2003. She advised that she could not recall specifics, but that the gate logs did not necessarily reveal her presence or absence at the plant.[3] She explained that she often went to her vehicle during the work day to get groceries or other things, and while she used her identification card to exit the gates, she did not always use it to reenter because the gates were open or she piggybacked into the plant. On days when Mr. Trujillo left early, she occasionally would exit the gates with him to obtain something from their vehicle and then return to the plant, sometimes piggybacking then as well. When Mr. Trujillo left early, a co-worker would give her a ride home.

---

[3]In his deposition, Mr. Trujillo made a similar claim. Essentially he said that if policy was followed, gate records would reflect accurate times of entries and exits to the plant but that no one followed policy and thus the gate logs did not accurately reflect time worked.

PacifiCorp made a follow-up call to Mrs. Trujillo on June 22. At that time, she gave the same explanation for the discrepancies: the gate logs were not necessarily reflective of the times she worked. She also recalled that she had previously turned in revised time cards to one of her supervisors. A final discussion regarding Mrs. Trujillo's time theft was held in August after she returned to work from caring for her son. To substantiate her previous claims, Mrs. Trujillo was asked to provide names of employees with whom she had ridden in or out of plant and employees who had given her a ride home. Although the employees did not give specific dates and times that Mrs. Trujillo piggybacked, they were able to confirm that they had given her rides in and out of the plant and to home during the relevant time period. Nonetheless, Mrs. Trujillo was terminated on August 25. In the termination letter, Pacificorp alleged she intentionally falsified time records to show that she had worked 7.8 hours of regular time and 5.1 hours of overtime for the time period of April 23 through May 29, 2003.

## II

We review the district court's decision de novo, applying the same legal standards applicable in the district court, including a view of the evidence in the light most favorable to the Trujillos and drawing all inferences in their favor. *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 483 (10th Cir. 2006). Summary judgment is appropriate only "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The Trujillos claim they were terminated because of the healthcare costs associated with their son's illness. Title I of the ADA provides covered employers shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). PacifiCorp is a covered employer subject to requirements of the ADA. Disability discrimination includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* at § 12112(b)(4). This prohibition is known as the "association provision" of the ADA. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1082 (10th Cir. 1997). "A family relationship is the paradigmatic example of a 'relationship' under the association provision of the ADA." *Id.* (citing 29 C.F.R. § 1630.8). The Trujillos' relationship to their son is protected by the association provision.

To succeed on appeal, the Trujillos must satisfy the four elements of the prima facie case of ADA association discrimination, which we enumerated in *Den*

*Hartog* as follows:

> (1) the plaintiff was "qualified" for the job at the time of the adverse employment action;
>
> (2) the plaintiff was subjected to adverse employment action;
>
> (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability;
>
> (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Id*. at 1085. Under the familiar *McDonnell Douglas* burden shifting framework, the burden shifts to PacifiCorp to proffer a legitimate, non-discriminatory reason for terminating the Trujillos if the Trujillos establish a prima facie case of an association discrimination claim. *Id.* Once PacifiCorp proffers a non-discriminatory reason, the burden shifts back to the Trujillos to provide evidence that the stated reason is pretextual. *Id.* To show pretext, the Trujillos must establish by a "preponderance of the evidence that the legitimate reasons offered by [PacifiCorp] were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). At this stage, the trier of fact may consider evidence establishing the prima facie case and "'inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 255, n.10).

-10-

<u>Prima Facie Case</u>

The district court determined the Trujillos met the first three elements of the prima facie ADA association discrimination test, and PacifiCorp does not contest that determination. As to the fourth prong, the court held the Trujillos failed to raise a reasonable inference that the disability of Charlie was a determining factor in PacifiCorp's decision to terminate them.

In granting PacifiCorp summary judgment, the district court relied heavily on *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698 (7th Cir. 2004). In *Larimer*, the plaintiff claimed he was terminated because his twin daughters were born prematurely and thus had the potential to cost his employer greatly in medical benefits. *Id.* at 699. The plaintiff's asserted reason for the termination led the court to categorize three types of ADA association discrimination cases.

> [The categories] can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours.

*Id.* at 700. Although it conceded that the case did not fit neatly into any of these categories, the court analyzed it as an "expense" case. *Id.* at 701. Because Mr. Larimer could not show his "supervisors [had] a financial stake in the company's performance and thus a stake, however attenuated, in the firing of an 'expensive' employee," the court held that he could not satisfy the final element of his association discrimination claim. *Id.* at 701.

Taking guidance from *Larimer*, the district court here designated this as an expense case and focused on the evidence suggesting that the healthcare costs of Charlie's cancer motivated PacifiCorp to terminate his parents. The expense factor dominated the court's decision. Without evidence of corporate tracking of health benefits in the budget or a tie between compensation and healthcare savings or "similar evidence," the court held the Trujillos could not make a direct link between Charlie's illness and the asserted illegal motive to terminate them. Alpt. App., vol. I at 102-03. The court then considered circumstantial evidence of the expense factor. Here too, the court held the Trujillos fell short. It characterized the Trujillos' circumstantial evidence as (1) "general corporate statements about health care costs — including [a corporate] understanding that a minority of individual employees are responsible for a majority of corporate health care expenditures;" and (2) "PacifiCorp's use of rising health care costs to justify rate increases." *Id.* at 103. The court concluded that if such a general concern were enough to raise the "reasonable inference of disability

-12-

discrimination [it] would almost always be possible because employee health care costs are a pervasive concern of business managers and owners." *Id.* at 104. Although the court referred to the matter as a "close case," *id.* at 102, it found the evidence presented to be insufficient and concluded summary judgment was warranted.

Considering the evidence in the light most favorable to the Trujillos and our case law on establishing discriminatory motive, we disagree. Under the totality of the circumstances approach, the Trujillos raised the necessary reasonable inference of discriminatory motive to establish a prima facie case of association discrimination. *See Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736 (10th Cir. 1999) (applying totality of circumstances approach in ADA discrimination case). In so deciding, we consider the evidence presented regarding PacifiCorp's concerns about the cost of Charlie's illness and the temporal proximity between Charlie's relapse and the terminations.

In *Larimer*, the court noted that the plaintiff "made no effort to pitch his case" on the ground that the company had a stake, however attenuated, in firing an expensive employee. 370 F.3d at 701. A thorough review of the record reveals the Trujillos not only made the effort but also established the necessary connection. As enumerated in the background facts, the Trujillos offered everything from evidence of general concerns about the rising cost of healthcare to the specific facts that Charlie's claims were considered high dollar, that there

-13-

was only one other terminal illness during the relevant time period, and that PacifiCorp was keeping tabs on those claims.[4] While PacifiCorp seems to suggest the Trujillos needed direct evidence that the company was "monitoring the individual costs being incurred by the Trujillos' son for medical treatment," Aple. Br. at 16, they only needed to present enough evidence for a reasonable inference of that premise to arise. *See Butler*, 172 F.3d at 749 (holding plaintiff could establish prima facie elements of discrimination through circumstantial evidence). The facts in the record raise such an inference.

Highlighting that evidence, we note that, contrary to the district court's assertion otherwise, the Trujillos presented evidence that insurance costs factored into the budget line item for labor costs of each employee. *Larimer* indicates this evidence weighs heavily in favor of demonstrating motive to discriminate against an expensive employee, and we agree. A "manager would care about the actual expense for health services to the relatives of an employee in his unit because that expense would be in his budget." *Larimer*, 370 F.3d at 701. Evidencing that management knew about the cost of Charlie's healthcare, the Trujillos offer an

_____

[4]The cost of Charlie's illness was not only borne out in the cost of Charlie's medical care, but also in the loss of work hours from the Trujillos while they attended to their son. Mr. Trujillo suffered severe mental stress during the time of Charlie's illness causing him to take additional time off from work. Charlie's illness caused the Trujillos to use FMLA leave, other unpaid leave, donated leave, and personal time off. While PacifiCorp did not pay the Trujillos for this time off, their healthcare coverage extended throughout the period. In that sense, the Trujillos were costly to PacifiCorp because PacifiCorp provided something to the Trujillos for which it received nothing in return.

-14-

email regarding Mrs. Trujillo's personal leave related to Charlie's illness in which the company stated it monitored both health and welfare benefits in conjunction with an employee's personal leave. From the evidence the Trujillos presented — concerns about rising healthcare costs, numerous efforts to cut those costs, corporate monitoring of general healthcare costs and of Charlie's claims specifically — a jury could reasonably infer that PacifiCorp terminated the Trujillos because they were expensive employees.

When we also consider the temporal proximity between Charlie's relapse and the investigation of the Trujillos, we are persuaded the Trujillos established the necessary inference that PacifiCorp wanted to rid itself of these employees because their son's terminal illness made them too expensive. The Trujillos' strongest evidence of discriminatory motive is found in the temporal proximity between the time of Charlie's relapse and the investigation of the alleged time theft and their termination. Yet the district court only made a passing reference to "the timing and quality of the investigation," aplt. app., vol. 1 at 102, concluding the evidence was insufficient to establish the necessary reasonable inference of discriminatory motive. Our case law requires the opposite conclusion.

Depending on the specific facts of the case, temporal proximity can contribute to an inference of discrimination. *See Butler*, 172 F.3d at 749 (temporal proximity between ADA plaintiff's request for accommodation and

decline in his work evaluations and satisfaction with his work performance contributed to discriminatory inference).  The closer in time a protected action (the claims resulting from Charlie's relapse) is followed by an adverse action (the investigation and termination), the more likely temporal proximity will support an inference of discrimination.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999).  Here the time period between the adverse employment action and the protected activity is less than three weeks as to Mr. Trujillo and approximately six weeks as to Mrs. Trujillo.

Close temporal proximity is important in establishing a prima facie case of association discrimination case.  *Den Hartog* specifically references consideration of the "circumstances" under which the adverse action arose as part of the fourth prong of the prima facie case.  *Den Hartog*, 129 F.3d at 1085.  This is appropriate given the difficulty in establishing an expense case.  As is the case of discrimination claims in general, direct evidence of discrimination resulting from costs to the company will be rare.  *Phelps v. Field Real Estate Co.,* 991 F.2d 645, 649 (10th Cir. 1993).  Where as here, the temporal proximity is close, it is a circumstance that should be given considerable weight.[5]

---

[5]In fact, in the context of retaliation claims, we have permitted plaintiffs to establish a prima facie case of discrimination by showing only close proximity in time between a protected activity and an adverse action.  *Compare Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239-40 (10th Cir. 2004) (prima facie case established where university declined to interview and hire plaintiff who prevailed in lawsuit against university only one month before); *Anderson*, 181 F.3d at 1179 (temporal

(continued...)

Against the backdrop of the concerns about rising healthcare costs and, more specifically, the awareness of the high cost of Charlie's healthcare, the temporal proximity between Charlie's relapse and the decision to terminate both Trujillos powerfully demonstrates the necessary reasonable inference that PacifiCorp terminated the Trujillos for an illegal reason. With this evidence, the Trujillos have established a prima facie case of association discrimination in the expense category.

---

[5](...continued)
proximity of nine weeks could establish causation); *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994) (one and one-half month period between protected activity and adverse action may, by itself, establish causation), overruled on other grounds by *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194-97 (10th Cir.1998); *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 386 (10th Cir. 1989) (sustaining finding of retaliation where termination occurred within two hours of engaging in protected activity); *with Antonio v. Sygma Network, Inc.*, 458 F.3d 1177,1181-82 (10th Cir. 2006) (nine months too temporally remote to support inference of causation); *Haynes v. Level 3 Comm'ns, LLC,* 456 F.3d 1215, 1228 (10th Cir. 2006) (employee could not show discrimination under Title VII, ADEA, and ADA where seven months intervened between protected activity and retaliatory conduct); *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (time period between two to three months not sufficient alone to establish causation in Title VII failure-to-hire case); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period, standing alone, insufficient to establish causation); *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001) (declining to decide whether temporal proximity of two months and three weeks alone sufficient to establish prima facie case). Our reference to these cases is not intended to suggest that an association discrimination plaintiff can establish the fourth prong of the prima facie case by showing temporal proximity alone, but rather to stress the weight of the factor in analyzing whether a discrimination plaintiff has raised a reasonable inference of a motive to discriminate.

Legitimate Business Reason and Pretext

Once the prima facie case is established, we look at the proffered non-discriminatory reason for the termination. PacifiCorp asserts that the Trujillos intentionally falsified time records in order to earn compensation for time they had not worked. The Trujillos do not argue that PacifiCorp's proffered reason for their terminations is not a basis for firing them, only that it is a pretextual reason. To defeat PacifiCorp's claim on summary judgment, "the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir. 1997).

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1323 (internal quotation marks omitted). As with the prima facie case, there is no one specific mode of evidence required to establish the discriminatory inference. *See E.E.O.C. v. Horizons/CMS Healthcare Corp.*, 220 F.3d 1184, 1198-99 (10th Cir. 2000). Rather, pretext can be shown in a variety of ways, including but not limited to differential treatment of similarly situated employees and procedural irregularities. The former is "especially relevant" where the defendant has proffered a legitimate non-

discriminatory reason for the adverse employment action. *Id*. at 1195 n. 6.

The Trujillos offered evidence regarding the differential treatment of similarly situated employees.[6] For example, approximately four weeks prior to Mr. Trujillo's termination, another long term employee, Linda Todd, was under investigation by the same management employees for two separate incidents in which she made threats of violence against other employees. During the course of the investigation, Ms. Todd maintained that stress caused her behavior. She was initially put on short term disability leave until her situation improved, although she was ultimately terminated for working while on that leave, drug and alcohol abuse and workplace violence. The treatment of Ms. Todd differs drastically from the treatment of both Trujillos. Rather than progressively discipline the Trujillos, taking into consideration their past performance and their current situation, PacifiCorp immediately terminated them. The Trujillos also presented evidence of a situation in which an employee was not terminated after committing serious misconduct by viewing pornography twice on company computers. Finally, severely undermining the company's claim that time theft resulted in immediate termination, the Trujillos offered evidence that many other employees were punished with days without pay, rather than termination, for time sheet violations. This disparate treatment of similarly situated employees

---

[6]Mr. Arambel, the plant manager, testified that all employees are subject to the same disciplinary policies. Mr. Arambel stated he considered all offenses listed in the disciplinary policy as "serious offenses" to be equally serious.

contributes to a reasonable inference of pretext, defeating PacifiCorp's claimed legitimate business reason for terminating the Trujillos.

We also note the inferences that can be drawn from the irregularity of PacifiCorp's actions in the course of the time theft investigation. Evidence presented to the district court indicates that comparing an employee's time sheets to his gate log records was an unreliable method of determining whether an employee purposefully attempted to be paid for hours not worked. The same is true when comparing records of employees who were assumed to come in and out of work together. Although PacifiCorp appears to have a policy in place for both recording time worked and entry and exit of the plant, there was evidence that the policy did not reflect what actually occurred in practice. PacifiCorp's sudden claim that a comparison of the Trujillos' time and gate records should exactly reflect the hours they self-recorded is suspicious given that managers, supervisors, and employees testified that neither time sheet nor gate access procedures were followed.

We also consider the failure to interview Dan Michaelis in the course of the investigation a significant circumstance contributing to the inference of discrimination. Mr. Michaelis, one of the Trujillos' supervisors during the outage, was never asked about the alleged overage on their time cards although he had signed some of their time sheets during the relevant time period. In an affidavit, Mr. Michaelis averred that due to Charlie's illness, he had allowed both

Trujillos to leave early without any adjustment to their time in order to attend to their son.

Additionally, we note PacifiCorp's failure to apply its assumptions that the Trujillos came to work together to the benefit of the Trujillos. PacifiCorp only construed the evidence resulting from the comparison of their gate logs and time to sheets to the detriment of the Trujillos. For example, Mr. Trujillo's termination letter listed the fact that gate logs did not substantiate the hours he had listed on his May 18 and May 27 time sheets. While Mrs. Trujillo's gate logs showed attendance for the proper number of hours on those days, the company nevertheless ignored an assumption that Mr. Trujillo was there when his wife was, and used those dates as a basis for termination. Likewise, while records show that on May 10, 2003, Mr. Trujillo entered the plant earlier than the scheduled shift, Mrs. Trujillo was terminated, in part, for not having a gate entry prior to the entry of the start of the same shift.

The failure to progressively discipline the Trujillos as PacifiCorp did other similarly situated employees, in addition to its failure to conduct what appeared to be a fair investigation of the Trujillos' alleged time theft, create genuine issues of material fact on whether PacifiCorp's reason for terminating them was pretextual. "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147.

PacifiCorp criticizes the Trujillos' case as one requiring us to build

-21-

inference upon inference to establish the requisite discriminatory motive. To support its argument, PacifiCorp cites *Ennis v. National Association of Business and Educational Radio, Inc.*, 53 F.3d 55 (4th Cir. 1995), an association discrimination case in which the plaintiff alleged she was terminated because she had a child who was HIV-positive. *Id.* at 62. To establish an inference of discrimination, the plaintiff presented evidence of a memorandum to employees suggesting that expensive claims would increase employee premiums. *Id.* at 57. The document was issued seven months prior to her termination. From these circumstances, the plaintiff wanted an inference that her employer terminated her because of her child's chronic disease. Given her relatively short tenure and a record replete with evidence that her employer had been unhappy with her performance, there was no reasonable inference of a nexus between cost of the child's health problems and plaintiff's termination. *Id.* at 62 ("The building of one inference upon another will not create a genuine issue of material fact. Mere unsupported speculation, such as this, is not enough to defeat a summary judgment motion.") (internal citations omitted).

This case shapes up quite differently. In this record, there was considerable evidence of concern about healthcare costs and facts that demonstrated that the company was aware high dollar claims like Charlie's could only increase those costs. Upon news of Charlie's relapse, the company used unusual auditing procedures to demonstrate that their long term employees, the

Trujillos, defrauded them of a total of exactly 40 hours. Although the company had progressively disciplined similarly situated employees for the same or equally serious offenses, it immediately terminated the Trujillos. Although the couple together served PacifiCorp for 28 years, they were never given the benefit of the doubt during the investigation. Rather, the company seemingly relied only on evidence to the detriment of the Trujillos and failed to interview key witnesses. When viewed in the light most favorable to the Trujillos, the evidence provides a reasonable inference that the Trujillos were costing the company time and money and considered it better to terminate them than to incur the costs of Charlie's illness.

**III**

The Trujillos also contend PacifiCorp terminated them in violation of ERISA. Section 510 of ERISA makes it illegal for an employer to terminate any person "for the purpose of interfering with the attainment of any right to which such [person] may become entitled to under [an employee benefit plan]." 29 U.S.C. § 1140. To make a prima facie case of interference with ERISA benefits, the Trujillos must establish "by a preponderance of the evidence [] that [their] discharge was motivated by an intent to interfere with employee benefits protected by ERISA." *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993).

As we concluded above, the Trujillos provided sufficient evidence that the

decision to terminate them was based on discriminatory intent to violate the ADA. That evidence also supports an inference that their discharge was motivated by an intent to interfere with their ERISA benefits. The district court's summary decision on this claim was in error as well.

## IV

We **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.