David M. Ebel, U.S. CIRCUIT JUDGE
Title VII of the Civil Rights Act of 1964 ("Title VII") makes it unlawful for an employer *1286 to "discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. 2000e-2(1). In this case, Plaintiff Joel Hererra alleges that his former employer, United Airlines, Inc. ("United"), violated Title VII by unlawfully terminating his employment on the basis of his Hispanic national origin.[1] The Court has before it Defendant's motion for summary judgment. [Doc. 27]. For the following reasons, the motion for summary judgment is GRANTED.
I. LEGAL STANDARD
A movant is entitled to summary judgment if it shows "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Reviewing the depositions, interrogatories, affidavits, exhibits, and other record materials, this Court draws all reasonable inferences in favor of the nonmovant, here the Plaintiff. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). If a rational jury could find for Plaintiff, then summary judgment is unwarranted. See, e.g., Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).
II. GENERAL BACKGROUND
In the summer of 2015, Plaintiff Joel Herrera was convicted in Arapahoe County court of Driving While Ability Impaired ("DWAI") with two or more priors and sentenced to serve a six-month term of imprisonment in the Arapahoe County Jail with a mandatory minimum of sixty days.[2] To Herrera's surprise, Herrera Dep. at 39:11-25 [Doc. 27-1], immediate work release was authorized by the Arapahoe County Court. As part of that work release program, Herrera was authorized to leave prison during the pendency of his sentence for the sole purpose of attending work, and was required to wear an ankle monitor and have an interlock device installed in his vehicle which prevented him from driving unless he first blew into the device and established his sobriety.
At the time, Herrera was working as an Aviation Maintenance Technician for United, based out of Denver International Airport ("DIA"). Herrera had worked with United since 1989, and was described as a "good technician," of whom people spoke highly. Terenzio Dep. at 7:19-20 [Doc. 27-2]. As a Technician, Herrera reported to a Supervisor, who in turn reported to an Operating Manager, who himself reported to United's Director of Aircraft Maintenance at DIA. In 2015, Herrera's Operating Manager was Mark Moore, and the Director of Aircraft Maintenance was Mario Terenzio. During the relevant time period for this case Herrera worked the "midnights" shift, which meant he reported to work at 8:45 pm and departed at 10:15 am the next morning. Herrera Dep. at 30:21-23. As an Aviation Maintenance Technician, Herrera worked out of a maintenance hangar rather than the public terminals.
*1287 While not a full-blown employment contract, United's Working Together Guidelines outline the broad standards it expects its employees to meet. Doc. 27-3 at i. ("The Working Together Guidelines are a series of harmonized policies, programs and other relevant information that apply to domestic, U.S. or GUM-based co-workers, except where otherwise noted or otherwise addressed by collective bargaining agreements, division manuals or work rules."). The Guidelines indicate that "United is an at-will employer, meaning that a co-worker may end his or her employment at any time[, and] this policy enables United to modify or terminate at its discretion and without notice or cause a, co-worker's employment status[.]" Id. at iv. They further note that "regular and predictable attendance is an essential function of every job and is extremely important to our collective success." Id. at 37. Finally, the guidelines note that "United is fully committed to complying with federal, state, and local governmental agencies with regard to retaining co-workers with arrest records provided they are able to freely perform their role and responsibilities." Id. They conclude, however, by specifying that "[e]very co-worker is responsible for maintain[ing] their eligibility to work for United by refraining from any activities that result in criminal convictions that may prohibit them from performing their duties for the company." Id.
Following his arrest, and during the pendency of his legal proceedings, Herrera had multiple conversations with Mark Moore, informing him as to the status of Herrera's case, and, on at least one occasion, discussing the possibility of Herrera participating in a work release program. Herrera Dep. at 48:18-21. Herrera interpreted Moore's comments during that conversation to suggest that United would not object to Herrera's participation in the work release program because other United employees had participated or were currently participating in a work release program. Id. Moore also approved Herrera's request to take some vacation days in order to attend his trial, and reviewed Herrera's timesheets to ensure that his time off was being accurately tracked.
In late August, following his sentencing, Herrera reached out to Mario Terenzio, the Director of Aircraft Maintenance at DIA to officially request that United support his participation in the court's work release program. Following this conversation, Terenzio contacted Linda Ross, United's Human Resources Manager for Technical Operations for Chicago and Denver. During this conversation, Terenzio informed Ross of Herrera's work release request, described the program, and noted that Herrera would be forced to wear a tracking device on his ankle while participating in the program.
On September 1, 2015, Terenzio and other management met with Herrera at DIA for an investigative meeting regarding Herrera's work release request. While the Record is somewhat unclear as to whether Terenzio discussed Herrera's work release request with Ross prior to this meeting,[3] the Court, viewing the facts in the light most favorable to Herrera, will assume for the purposes of this motion that Terenzio and Ross first discussed Herrera's request prior to the September 1 meeting. Regardless, at the September 1 meeting, Terenzio took Herrera's badge, thereby precluding him from coming to work, and informed Herrera that Terenzio needed to "check *1288 with HR" as to whether United would support Herrera's participation in the work release program, and that Herrera would be placed on paid leave in the meantime. Herrera Dep. at 56:20-57:21.
After the September 1 meeting, Terenzio updated Ross on his meeting with Herrera and asked how he should proceed. It is undisputed that, as of this conversation, Ross "was unaware of any United employee who had been provided work release." Pl.'s Statement of Undisputed Material Facts ¶ 18 [Doc. 27]. Ross then proceeded to research whether United had previously addressed an employee's work release request. As part of this effort she spoke with her colleagues in United's Technical Operations department, as well as members of the labor relations and legal departments. Ross Dep. at 15:25-16-7. Ross's research did not reveal a single case where United considered-let alone supported-an employee's work release request. Based on this research, and in consultation with her superiors, Ross then informed Terenzio that "the company was not going to support the work release program for Mr. Herrera." Ross Dep. at 40:4-5.
It is unclear when exactly that decision was made, but Herrera was informed by letter on September 29, 2015 that he was being terminated effective immediately. Ex. E [Doc. 27-5]. The letter discussed Herrera's situation and United's "Working Together Guidelines" and employment policies, and announced categorically that "United does not support the work release program which impacts your ability to report to work." Id. The letter concluded that "After a thorough review of the facts, taking into consideration the seriousness of your actions, your disregard for the Company's policies and guidelines, and your inability to report to work absent a work release requirement, the decision has been made to terminate your employment with United Airlines, effective immediately." Id.
Herrera filed the instant lawsuit on August 1, 2016, alleging that United violated Title VII of the Civil Rights Act of 1964 by terminating him on the basis of his national origin. Doc. 1 . In support of his claim, Herrera purported to identify three "similarly situated white, non-Hispanic co-workers" who were allowed to participate in work release programs during 2014 and/or 2015: Byron Coffey, James Schneider, and Marty Mock. Complaint ¶ 11 [Doc. 1]. In addition to these employees, in response to United's motion for summary judgment Herrera also identifies Mark Leber, another Aircraft Mechanic in Denver whom Herrera alleges wore an ankle bracelet to work in 2009. Pl.'s Response to Def.'s Mot. for Summ. J. [Doc. 27] at 9.
III. DISCUSSION
Herrera's claim arises under Title VII, which makes it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2. Because it will often be difficult for a plaintiff to point to direct evidence of discrimination, Title VII claims can be analyzed through the now-familiar McDonnell Douglas framework.[4]
Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).
*1289 Once the plaintiff presents such evidence, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." Id. If the employer is able to do so, the burden shifts back to the plaintiff to offer some admissible evidence that the employer's proffered legitimate reasons are "in fact pretext." Id. at 804, 93 S.Ct. 1817. If plaintiff is able to do so, the case must survive summary judgment and proceed to a full trial on the merits. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1226 (10th Cir. 2000).
While the McDonnell Douglas framework presents several acute inquiries at each stage, the ultimate question is whether the defendant acted with a discriminatory motive or intent. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Furthermore, notwithstanding the shifting burdens of production the McDonnell Douglas Court adopted to assist in evaluating this question at the summary judgment stage, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
A. Prima Facie Case
Under McDonnell Douglas, the plaintiff bears the burden of first establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish this prima facie case the plaintiff must demonstrate "that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.' " Kendrick, 220 F.3d at 1227. In the Tenth Circuit, a plaintiff meets this burden by showing that "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." Id. (citing Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999) ).
The plaintiff's burden at this stage is "not onerous." Burdine, 450 U.S. at 253, 101 S.Ct. 1089. Here, United argues that Herrera has failed to establish a prima facie case because regular and predictable attendance is "an essential function of every job" at United. Def.'s Mot. for Summ. J. at 9 [Doc. 27]. According to United, Herrera "was not able to freely perform his job responsibilities at the time of his termination because of the restrictions placed on him as a result of his incarceration," id., and so therefore he fails prong two of the prima facie test, see Kendrick, 220 F.3d at 1229 (requiring the plaintiff to establish that "he was qualified for his job").
The Court assumes without deciding that plaintiff has met his burden of establishing a prima facie case. See Annett v. Univ. of Kan., 371 F.3d 1233, 1235 (10th Cir. 2004) (assuming, without deciding, that plaintiff had established a prima facie case). In this case, as Plaintiff notes, Herrera's inability to attend work is inexorably tied to the allegedly pretextual decision not to grant Herrera's request for work release. See Pl.'s Response to Def.'s Mot. for Summ. J. at 12 [Doc. 30]. Therefore the Court will adopt Plaintiff's suggestion to consider the circumstances of Herrera's work release "as United's asserted non-discriminatory reason, since, up to the point where he was sentenced to work release, it is undisputed that Mr. Herrera was fully qualified for his job and performing satisfactorily." Id. Therefore we proceed to the second stage of the McDonnell Douglas inquiry.
*1290 B. Legitimate, Nondiscriminatory Reason
At this stage, the burden shifts to the defendant to offer a facially nondiscriminatory reason for taking adverse employment action against Herrera. See Kendrick, 220 F.3d at 1229-30. We have repeatedly said that this burden is "exceedingly light," and that a defendant may meet his burden by simply offering nondiscriminatory reasons; it is not required to prove their validity. See, e.g., Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1363 (10th Cir. 1997) (quoting Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1019 (11th Cir. 1994) ). The employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1279 (10th Cir. 1999) (quoting Burdine, 450 U.S. at 257, 101 S.Ct. 1089 ).
Before examining United's proffered explanation, it is important to identify the actionable adverse employment action. On a broad level, Herrera's allegation is that he was subjected to unlawful discrimination when United fired him. See Complaint [Doc. 1] ¶ 13 ("the discharge of Mr. Herrera ...constituted discrimination on the basis of national origin, ..."). On the other hand, it is unchallenged that Herrera's discharge was the result of United's decision not to support his participation in the work release program. This left Herrera unable to meet United's Working Together Guidelines, which clearly state that an employee's "regular and predictable attendance is an essential function of every job." [Doc. 30-5]. Therefore, if the discharge was the result of United's work release decision, it is more appropriate to define our inquiry as being whether the decision not to support Herrera's work release application was an illegitimate "adverse employment action" prohibited by Title VII. See Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (explaining that what constitutes "adverse employment action" is to be liberally defined). The question at this stage of the inquiry, then, is whether United can offer a legitimate, nondiscriminatory reason for not supporting Herrera's request to participate in the work release program.
In its termination letter to Herrera, United only noted summarily that it "does not support the work release program which impacts [Herrera's] ability to report to work." Exhibit E to Def.'s Mot for Summ. J. [Doc. 27-5]. Ross, the Human Resources officer involved in Herrera's case testified that she researched whether United had previously addressed an employee's work release request, and was unable to find a single case where United considered such a request. Ross Dep. at 15:25-16:7.
In the course of this litigation, United has further explained that its decision not to support the work release program in this specific instance was
principally based on Plaintiff's inability to freely perform his responsibilities without the restrictions inherent in a work release program, the risk that Plaintiff would not be able to predictably attend work during his incarceration and while on work release, the fact that if work release was approved for Plaintiff than [sic] it would need to be considered and potentially approved for all of United's 85,000 employees and the fact that Ms. Ross' research did not reveal any United employee who had been provided work release.
Def.'s Mot. for Summ. J. ¶ 22.[5]
Given the "exceedingly light" burden on *1291 Defendant at this stage, see Sprague, 129 F.3d at 1363, the Court concludes that Defendant's asserted interests in not wanting to approve work release for Mr. Herrera are both legitimate and nondiscriminatory. Therefore the burden shifts back to plaintiff to present "evidence that the defendant's proffered reason for the employment decision was pretextual-i.e. unworthy of belief[.]" Kendrick, 220 F.3d at 1230 (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995) ).
C. Pretext
Once the McDonnell Douglas inquiry reaches the third stage, "the presumption of discrimination created by the plaintiff's prima facie case 'simply drops out of the picture.' " Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ). At this point the plaintiff is required to show pretext by "demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Swackhammer, 493 F.3d at 1167 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ).
A plaintiff is not forced to choose any particular means of demonstrating pretext, Kendrick, 220 F.3d at 1230. Here, Herrera contends "procedural irregularities" surrounding his termination give rise to an inference of pretext. See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002) (identifying the existence of procedural irregularities as one way in which pretext can be suggested). Specifically, Herrera argues that United has given "several different variations of the asserted reason [for not supporting the work release program] ...each of which is untrue, implausible and incredible." Pl.'s Response to Def.'s Mot for Summ. J. at 15.
The Court is not so persuaded by this bald assertion. Instead, the Record and the course of conduct throughout this litigation showcases a consistent and plausible explanation for United's decision: that United Management was unable to find a single instance of an employee being granted work release, and United was not willing to extend Herrera the privilege of work release in this instance because of concerns for how it would interfere with his employment, and its implications for future, similar, requests.
Ross testified that during one of her earliest conversations with Mr. Terenzio she advised him "that we needed to determine whether or not the company would support the work release program before Mr. Herrera was allowed to report back to work." Ross Dep. 35:7-10. Ross further testified that her ensuing research did not turn up a single instance of the company supporting an employee's work release request. Id. 16:13-19. Less than a month later, Herrera's termination letter indicated *1292 that he was being discharged because "United does not support the work release program which impacts your ability to report to work." Ex. E to Def.'s Mot. for Summ. J. [Doc. 27-5]. Finally, throughout the course of this litigation, Defendant has admitted that it "refused Plaintiff's request for work release and terminated Plaintiff as set forth in [the] letter." Answer [Doc. 14] ¶ 10. It has consistently maintained that it refused the request
principally based on Plaintiff's inability to freely perform his responsibilities without the restrictions inherent in a work release program, the risk that Plaintiff would not be able to predictably attend work during his incarceration and while on work release, the fact that if work release was approved for Plaintiff than [sic] it would need to be considered and potentially approved for all of United's 85,000 employees and the fact that Ms. Ross' research did not reveal any United employee who had been provided work release.
Def.'s Mot. for Summ. J. ¶ 22. The Court finds nothing "untrue," "implausible," or "incredible" about United's consistent explanation.
Another way Herrera can show pretext is by providing (1) direct evidence that the stated reason for the adverse action is false; or (2) evidence that the plaintiff was treated differently from other similarly-situated employees. Ramirez v. The GEO Grp. Inc., 655 F.Supp.2d 1170, 1179 (D. Colo. 2009) (citing Swackhammer, 493 F.3d at 1167 ). The Tenth Circuit has called the latter evidence "especially relevant" in cases where the defendant has offered a legitimate nondiscriminatory reason for the adverse action. Trujillo v. PacifiCorp, 524 F.3d 1149, 1158 (10th Cir. 2008). While Herrera points to no direct evidence, United's categorical statement that Herrera was discharged because "United does not support the work release program" provided an opportunity for Herrera to demonstrate pretext using differential treatment of similarly situated employees. However Herrera has been unable to provide the Court with any admissible evidence showing that United knowingly allowed a non-Hispanic employee to participate in a work release program. Thus, Herrera has failed to provide any comparator evidence of pretext.
According to the scheduling order entered on October 25, 2016, Herrera had five months to conduct discovery on United's employment practices. Courtroom Minutes [Doc. 19]. He was permitted to take the deposition of five non-expert witnesses, and was allowed to issue twenty-five interrogatories, twenty-five requests for production, and twenty-five requests for admission. Id. All this came on the heels of Herrera filing a Charge of Discrimination with the Colorado Civil Rights Division and Equal Employment Opportunity Commission on January 26, 2016, and receiving a Notice of Right to Sue from the administrative entities on June 6, 2016 and August 1, 2016 respectively.
Despite this extensive discovery, however, Herrera has been unable to offer even a single instance where United supported a non-Hispanic employee's work release request. Nonetheless, because the comparators Herrera does identify are critical to his claim, the Court will pause to dwell on the facts that were discovered as to each of these individuals.
With regards to Marty Mock, Plaintiff testified during discovery that he saw Mock wearing an ankle monitor and observed an interlock in Mock's car. Herrera Dep. 102:12-13. On the basis of these facts, Plaintiff believed that Mock was on work release, id., but Plaintiff admitted that beyond those facts he had no "personal, independent knowledge that Mr. Mock has ever been on work release while working at United Airlines." Id. at 101:16, 102:24-103-7.
*1293 Nor could Herrera have had such knowledge, because in fact Mock "has never been sentenced to work release." Interview with Marty Mock [Doc. 30-6]. While Mock was arrested for DWAI in 2014, he was never sentenced to jail, and was only required to wear his ankle bracelet for ten days. Id. Because of regular days off and vacation days, Mock only wore the ankle monitor while at work at United for four days, and, importantly, he "did not inform any United management employee that he was wearing an ankle bracelet." Id.
Similarly, Herrera testified that he has no personal, independent, concrete knowledge that James Schneider was ever on work release while employed at United Airlines. Herrera Dep. at 100:9-14. Again, nor could he, as Schneider was never on a work release program. Interview with Jim Schneider [Doc. 30-6].[6] Schneider did spend seventy-five days in jail in 2014, but "was able to use vacation time to cover the great majority of days when he was supposed to be at work and was instead in jail and unavailable to work." Id. Of the seventy-five days he spent in jail, only four days were not covered with vacation, and United management marked him "N/A" on those days. Id. Upon his return to work, Schneider was issued a strike in the Attendance Discipline program to hold him accountable for missing those days. Id.
Herrera does not allege that Mark Leber was ever on work release-in fact, he was not-but Leber did wear a court-ordered ankle bracelet to his job at United Airlines in 2009. Interview with Mark Leber [Doc. 30-6]. In an interview, Leber "could not definitively recall whether he ever informed anyone at United management of his situation, namely that he was wearing an ankle bracelet under his uniform." Id. [7] He did note that he "was not proud of his status and did not discuss the matter with his co-workers," and "did his best to hide the bracelet so it was not seen at work but he is relatively certain that a number of his co-workers knew he was wearing an ankle bracelet." Id.
As for Byron Coffey, Plaintiff testified that Coffey "told me, I'm on work release." Herrera Dep. at 51:5-6.[8] Herrera does not know whether Coffey ever informed any of his supervisors that he was on work release. Id. at 110:19-25. In his Response, Herrera includes a document from the Douglas County Justice Center which indicates only that a Byron Coffey "has successfully completed" 180 days of "In-Home Detention." [Doc. 30-7].[9]
*1294 The Court cannot find that the experiences of these individuals raise an inference of discrimination in United's decision not to support Herrera's work release. Two of Herrera's proposed comparators, Mock and Leber, were never on work release. Interview with Marty Mock [Doc. 30-6]; Interview with Mark Leber [Doc. 30-6]. Their experiences wearing ankle monitors and navigating interlock devices may cast doubt on the wisdom of United's decision not to support Herrera's work release request, but "arguments questioning the soundness of [United's] decisions are insufficient to show [United] acted dishonestly or in bad faith." Hiatt v. Colo. Seminary, 858 F.3d 1307, 1323 (10th Cir. 2017) (citing Swackhammer, 493 F.3d at 1169-70 ). The Court's job at this juncture is not to pass judgment on the intelligence of United's decision not to support the work release program, but rather to determine whether there is evidence in the record that could support an inference that its decision not to do so was motivated by an intent to discriminate against Herrera based on his national origin. See Sanchez v. Philip Morris Inc., 992 F.2d 244, 247 (10th Cir. 1993) ("Title VII is not violated by the exercise of erroneous or even illogical business judgment."). Nothing in Mock's or Leber's experiences provides such support.
Nor was Herrera's next comparator, Schneider, on work release. Interview with Jim Schneider [Doc. 30-6]. Schneider's experience could, however, be relevant in that he was given the opportunity to use vacation time to cover the majority of his time in jail, and United marked him as having unexcused absences during the days his accrued vacation would not cover. Id. After it decided not to support the work release program, United could, perhaps, have allowed Herrera a similar accommodation.
However Schneider was able to use vacation days to cover the vast majority of his sentence, and was only "absent" from work for four days. Id. At the time of his arrest, Herrera, on the other hand, had enough vacation time to cover only fourteen days of absence, Ex. G to Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J., and his mandatory minimum sentence was sixty days. Therefore, accommodating Herrera would have required United to accept significantly more unexcused absences than it did for Schneider. Its decision not to do so cannot support an inference of discriminatory intent. See Lounds v. Lincare, Inc., 812 F.3d 1208, 1236 (10th Cir. 2015) (holding that when an employer has "strict attendance requirements," an employee's "mounting attendance problem" is sufficient grounds for discharge). This conclusion is further bolstered by the fact that Schneider received a "strike" in United's discipline program for missing four days. Interview with Jim Schneider [Doc. 30-6]. United's decision to react more harshly to Herrera's imminent absence of significantly more than four days *1295 does not give rise to an inference of discrimination.
Finally, Herrera himself testified that Coffey "told me, 'I'm on work release.' " Herrera Dep. at 51:5-6. This testimony is inadmissible hearsay, which may not be relied upon at the summary judgment stage. See Thomas v. Int'l Bus. Mach., 48 F.3d 478, 485 (10th Cir. 1995) ("At the summary judgment stage, affidavits must set forth facts as would be admissible in evidence[.]") (internal quotation marks omitted). In his response to Defendant's summary judgment motion, Herrera attaches a report indicating that a "Byron K Coffey" had "successfully completed" 180 days of In-Home Detention in 2009, Doc. 30-7, but Herrera has introduced no admissible evidence that this In-Home Detention corresponded with Coffey's employment with United Airlines, that United Airlines knew of such in-home detention, or even that Mr. Coffey is non-Hispanic, see Herrera Dep. at 121:10-11 ("Q: What is Coffey's national origin, if you know? A: I don't know."). In addition, the document suggests that Coffey was sentenced to In-Home Detention, while Herrera was ordered to spend the balance of his time in jail, and was relying on a work release program to work at United. Thus, Herrera has not shown by admissible evidence that Coffey was a viable comparator.
Therefore, because Herrera is unable to present a similarly situated employee who did not share Herrera's national origin and who was treated different than he was, the Court finds that Herrera was failed to meet his burden to raise an inference of pretext in response to Defendant's legitimate nondiscriminatory reasons for failing to support Herrera's work release request.
IV. CONCLUSION
Following Mr. Herrera's arrest for DWAI, his employer had two options: It could support his request for work release, allowing him to continue to work while spending the balance of his non-working hours in jail, or it could terminate his employment. In response the legal system is not asked to sit in judgment of the wisdom of United's decision. Rather the system stands ready only to ensure the choice United made was not the product of unlawful animus or discrimination.
Upon careful review of the briefing the Court is unable to find sufficient evidence to give rise to an inference of such unlawful motivation. Given our current understanding of the deleterious effects of incarceration on our economy, the county court in this case should be commended for offering Herrera the opportunity to satisfy his sentence while on work release. Herrera is understandably disappointed United did not respond in kind, but that alone is not a violation of Title VII. Accordingly, Defendant's Motion for Summary Judgment dismissing with prejudice all claims in this cause of action [Doc. 27] is GRANTED.

Hererra initially also asserted a claim pursuant to the Age Discrimination in Employment Act, but has since confessed summary judgment as to that claim. Pl.'s Resp. to Mot. for Summ. J. at 2 [Doc. 30]. Accordingly the Court grants summary judgment dismissing Plaintiff's age discrimination claim.

Unless noted, the following facts are drawn from the parties' respective statements of Undisputed Material Facts. For the purposes of this summary judgment motion, all disputed facts have been resolved in Herrera's favor. See White v. General Motors Corp., Inc., 908 F.2d 669, 670 (10th Cir. 1990) ("All disputed facts must be resolved in favor of the party resisting summary judgment.").

Compare Terenzio Dep. at 29:7-21 (suggesting Terenzio spoke with Ross prior to September 1) with Ross Dep. at 34:11-22 (suggesting that while Terenzio and Ross spoke before the September 1 meeting, they did not discuss the work release request until after the meeting).

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Herrera argues that one asserted reason for United not supporting his work release was that "it would be bad for United's image to have an employee working with an ankle bracelet in front of the public." Pl.'s Response to Def.'s Mot. for Summ. J. at 13. Plaintiff then casts legitimate doubt on this motive by noting that Herrera worked the midnight shift in the maintenance hangar, out of sight of the general public. Defendant has not, however, advanced that explanation at this stage of the proceedings. See Def.'s Reply to Pl.'s Response to Def.'s Mot. for Summ. J. at 3 ("Ms. Ross ...did not emphasize public relations as one of the primary reasons for denying the request."). The Court does not doubt that the image of an employee in an ankle monitor may have played into United's ultimate decision, but for the purposes of this litigation its stated reasoning is much broader.

When the Court references "interviews" it is referring to the three interview summaries contained in Ex. 6 to Pl.'s Response to Def.'s Mot. for Summ. J. These summaries "were prepared by Labor Relations employees with United Airlines who conducted the interviews." Pl.'s Response to Def.'s Mot. for Summ. J. at 8 n.1. It is the Court's understanding that these interviews were not conducted under oath, nor have they been presented to the Court in a form admissible into evidence. Therefore they are, by themselves, insufficient to defeat summary judgment.

In fact, other than the statement that Leber could not definitively recall informing anyone at United management of his situation, there is no statement attributed to Leber that he did, or even may have, disclosed his ankle bracelet to United management. Thus, on this record, there is a total absence of any evidence that Leber disclosed his bracelet to management.

This testimony directly contradicts testimony previously offered by Herrera that he had no knowledge that Coffey was on work release. Herrera Dep. at 111:19-20. However, at this juncture, the Court does not make credibility determinations, Fogarty v. Gallegos, 523 F.3d 1147, 1165 (10th Cir. 2008), and draws all reasonable inferences in the light most favorable to Herrera, see Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

While he does not mention it in the text of his response, Herrera also references another United employee, William Bragg, in his Statement of Undisputed facts, and attaches an "Alternative Sentencing Burau [sic] Employer's Agreement," Pl.'s Response to Def.'s Mot. for Summ. J. Exhibit 9 [Doc. 30-9], which Herrerra suggests is evidence that Bragg, a mechanic at San Francisco International Airport, "received approval from United for continuing his employment while on work release," id. at 10 [Doc. 30]. First, this agreement may be inadmissible hearsay, although it is possible it could be admissible under the government records exception. See Fed. R. Evid. 803(8). Furthermore, the agreement does not include critical comparator information including Mr. Bragg's race, whether his "alternative sentencing agreement" was actually a comparable work release program, and whether Mr. Bragg's supervisor ever requested guidance from his superiors as to how to handle Mr. Bragg's request. For these reasons the Court has not considered Mr. Bragg when assessing Mr. Herrera's comparator evidence.